UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

JANE DOE,

   Plaintiff,

v.

MONTGOMERY COUNTY
BOARD OF EDUCATION,

   Defendant.

Civil Action No. 24-2810-TDC

## MEMORANDUM OPINION

Plaintiff Jane Doe has filed a civil action against Defendant the Montgomery County Board of Education ("the Board"), in which she asserts claims of harassment on the basis of sex, in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20–606(a)(5) (LexisNexis 2021); and unlawful retaliation, in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e-3(a), and the MFEPA, Md. Code Ann., State Gov't § 20–606(f). The Board has filed a Partial Motion to Dismiss in which it seeks dismissal of the retaliation claims only. Having reviewed the submitted materials, the Court finds that no hearing is necessary. See D. Md. Local R. 105.6. For the reasons set forth below, the Motion to Dismiss will be DENIED.

## BACKGROUND

In the Amended Complaint, Doe alleges the following relevant facts, which the Court accepts as true for purposes of the resolution of the Motion.

I.   **Employment History**

From July 1, 2021 to June 24, 2023, Doe was employed as an Assistant Principal at Farquhar Middle School ("Farquhar") in Olney, Maryland, a school within the Montgomery County Public Schools ("MCPS"), which are operated by the Board. Throughout the duration of her employment at Farquhar, Doe's immediate supervisor was Dr. Joel Beidleman, the Principal of Farquhar. Doe alleges that Beidleman subjected her to sexual harassment from the beginning of her employment at Farquhar through December 2022, and that Beidleman retaliated against her for rejecting his "efforts to engage in a personal relationship with her, and opposing his sexual advances and harassment." Am. Compl. ¶ 16, ECF No. 17. On June 24, 2023, Doe was involuntarily transferred to another MCPS school, Forest Oak Middle School ("Forest Oak") in Gaithersburg, Maryland.

II.  **Alleged Harassment**

Beidleman's alleged harassment of Doe began during the 2021-2022 school year. Doe alleges that at one point during that school year, Beidleman had a meeting with Doe and other female staff members during which he stated that although he typically would require administrative team members to dress up and wear makeup, he was "taking it easy" on Doe. *Id.* ¶ 17. On another occasion, Beidleman sought Doe out on school grounds, told her that he had learned that a school director was engaged to a Black woman, and then "proceeded to thrust his hips in her direction in a sexual manner." *Id.* ¶ 18. Doe, who is a Black woman, ignored Beidleman's actions, ended the conversation, and walked away. On December 3, 2021, Beidleman asked Doe about the gender of her significant other, and Doe again ignored the line of questioning and left the area. Later in the school year, on March 2, 2022, Beidleman came up to Doe in a hallway and did the "get low" dance next to her, during which he "essentially put[] his pelvis area

close to her." *Id.* ¶ 21. Doe physically moved away from him while he was doing this dance. From that point forward, any time Beidleman "would try to get physically close to her," Doe would find a reason to get away from him. *Id.* ¶ 22.

On March 28, 2022, Beidleman "tried to force" Doe to attend another staff member's birthday party "by cornering her in the mailroom." *Id.* ¶ 24. Doe told Beidleman that "she did not want any sort of personal relationship with him" and that she could not attend the party. *Id.* In June 2022, during an after-school fundraiser attended by teachers and students, Beidleman, who was serving as the disc jockey, played the song "Brick House" and said over the microphone that "this goes out to [Doe]." *Id.* ¶ 25.

Doe asserts that the sexual harassment continued during the 2022-2023 school year. On September 14, 2022, Beidleman called Doe "well after work hours," spoke for 50 minutes, and "attempted to proposition her" and to "start a personal relationship with her." *Id.* ¶ 26. During the call, Beidleman told Doe he wanted to talk about his feelings, complained that Doe listened to her professional mentor more than to him, and asked, "Do you even think that God has me in your life for a reason?" *Id.* In response, Doe "explicitly told [Beidleman] that she did not want a personal relationship with him." *Id.* ¶ 27. Later, while Doe was on sick leave between October 31 and November 7, 2022, Beidleman repeatedly called, texted, and emailed her even though employees are not supposed to be contacted while on sick leave.

### III.  Alleged Retaliation

According to Doe, immediately after the September 14, 2022 phone call in which she told Beidleman that she did not want to have a personal relationship with him, Beidleman began retaliating against her. The next day, on September 15, Beidleman sent Doe an email in which he included a "Memo Request for Conference" that falsely alleged that Doe had failed to meet a

professional capacity standard from the MCPS "Vision and Leadership Expectations for Assistant Principals, Assistant School [A]dministrators, and Coordinators of School-Based Programs." *Id.* ¶ 28. On September 18, Doe notified MCPS Associate Superintendent Diane Morris, who was Beidleman's supervisor, about both the September 14 phone call and the allegation in Beidleman's September 15 email, but Morris took no action in response. On September 29, Doe met with Beidleman and Dr. Eugenia Dawson, the Director of the MCPS Office of School Support, and discussed Beidleman's September 15 allegation against Doe. During the meeting, Beidleman "made it clear" that he "was upset with [Doe's] unwillingness to have anything more than a professional relationship with him." *Id.* ¶ 30. Doe alleges that, rather than addressing such inappropriate behavior, Dawson instructed Doe to be "more vulnerable" with Beidleman. *Id.*

On December 2, 2022, while in a hurry to leave at the end of the school day, Doe closed her office door in order to grab her coat from behind the door. Beidleman, however, then falsely accused Doe of slamming the door in his face. When Beidleman tried to talk to Doe about the incident, Doe, who perceived the accusation to be another form of retaliation, told him that she was "not able to process this at this time." *Id.* ¶ 33. Beidleman then demanded a written explanation of the incident by December 5, 2022 at 3:00 p.m. On December 5, 2022 at 8:00 a.m., before the stated deadline, Beidleman placed Doe on administrative leave. As a condition of this form of administrative leave, Doe was required to meet with the MCPS Director of Compliance and Investigation, who questioned her about her mental health. Then, before she was allowed to return from administrative leave, Doe was required to undergo an Independent Medical Examination ("IME"), which found no evidence that she was mentally unfit. The IME report noted that Doe had been placed on administrative leave because Beidleman had accused her of exhibiting mental health symptoms. According to Doe, the stress of being placed on administrative leave and

accused of having a mental health condition led her to request and use some of her medical and annual leave.

On February 16, 2023, Doe was placed on the "involuntary transfer list," an action which she attributes to her use of medical leave as a result of Beidleman's false accusations and retaliation. At the end of the school year, on June 24, 2023, Doe was involuntarily transferred to Forest Oak. Doe asserts that Forest Oak "was an undesirable assignment" both because it "significantly lengthened" her commute to work and because it was "less prestigious" because Forest Oak is one of the "lowest underperforming schools" in MCPS, while Farquhar is "one of the highest performing schools." *Id.* ¶ 40.

## IV. The Complaint

The presently operative Amended Complaint against the Board alleges three claims, in the following numbered counts, arising from Beidleman's alleged sexual harassment of Doe and retaliation against her for opposing that harassment: (1) a claim for harassment on the basis of sex, in violation of the MFEPA, Md. Code Ann., State Gov't § 20–606(a)(5); (2) a claim of retaliation, in violation of the MFEPA, Md. Code Ann., State Gov't § 20–606(f); and (3) a claim of retaliation in violation of Title VII, 42 U.S.C. 2000e-3(a). On the retaliation claims, Doe asserts that her placement on administrative leave, the questioning of her mental health that led to the requirement that she submit to an IME to assess her mental health, and her involuntary transfer to Forest Oak were all actions taken in retaliation against her for opposing Beidleman's sexual harassment of her.

## DISCUSSION

In its Motion to Dismiss, the Board asserts that the retaliation claims in Counts 2 and 3 should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because Doe has not

5

pleaded sufficient facts to establish any of the elements required to state a claim of retaliation under Title VII or the MFEPA.

## I. Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

The Title VII provision relating to retaliation claims states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any . . . individual . . . because he has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). To state a retaliation claim under Title VII, a plaintiff must allege facts supporting the conclusion that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) "the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted). Courts may apply this same framework to MFEPA retaliation claims. *See Hawkins v. Leggett*, 955 F. Supp. 2d 474, 497 (D. Md. 2013) (stating that courts "judge" MFEPA retaliation claims "under the same standards as Title VII"); *see also Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 & n.8 (Md. 2007) (noting that Maryland courts "traditionally seek guidance from federal cases" in interpreting the MFEPA).

## II.     Protected Activity

As to the first element of a retaliation claim, protected activity consists of "oppos[ing] any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3. Such employment practices include those that discriminate against employees with respect to their "terms, conditions, or privileges of employment" on the basis of race, color, religion, sex, or national origin. *See id.* § 2000e-2. Protected activity under Title VII is not limited to the filing of formal charges of discrimination. *See Laughlin v. Metro Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Courts take an "expansive view of what constitutes oppositional conduct." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). It "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin*, 149 F.3d at 259 (4th Cir. 1998). A plaintiff's actions are assessed in their totality, rather than as individual, discrete acts, to determine whether the plaintiff has opposed unlawful discrimination. *See DeMasters*, 796 F.3d at 418. Protected activity includes opposing employment practices that are either "actually unlawful under Title VII" or "reasonably believe[d]" by the employee to be unlawful. *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015).

Here, Doe argues that her repeated physical and verbal rejections of Beidleman's harassing conduct constitute protected activity. For example, Doe references the two separate occasions during the 2021-2022 school year when she rebuffed Beidleman's harassment by ignoring and moving away from him, specifically after he referenced that a school director was engaged to a Black woman and "thrust his hips in her direction in a sexual manner," Am. Compl. ¶ 18, and after he did the "get low" dance in March 2022 and "essentially put[] his pelvis area close to her," *id.* ¶ 21. Doe also asserts that she engaged in protected activity on March 28, 2022, when she told

7

Beidleman during an encounter in the mailroom that she did not want to have a personal relationship, and on September 14, 2022, after Beidleman attempted to "proposition her and start a personal relationship with her" during the lengthy, after-hours phone call. *Id.* ¶¶ 24, 27.

Though the United States Court of Appeals for the Fourth Circuit has not specifically considered whether rejecting a supervisor's sexual advances and allegedly harassing conduct constitutes protected activity for purposes of a retaliation claim, the majority of United States Courts of Appeals that have considered this issue have concluded that such verbal or physical rejections qualify as protected activity. *See, e.g., Huang v. Ohio State Univ.*, 116 F.4th 541, 562 (6th Cir. 2024) (finding that an employee who resisted a supervisor's sexual advances by "pushing his hands off her or moving away from him whenever he touched her inappropriately" engaged in protected activity even though the employee never told her supervisor "'no,' or to 'leave me alone'"); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (concluding that "a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII."); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (holding that an employee engaged in protected activity when she told her supervisor "to stop his offensive conduct"); *see also Owen v. Cnty. of Franklin*, 358 F. Supp. 3d 545, 551 (W.D. Va. 2019) (citing *New Breed Logistics* and *Ogden* and agreeing with the Sixth and Eight Circuits that "an employee engages in protected activity when the employee asks a supervisor to stop his sexually harassing behavior"). *But see LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir. 2007) (finding that "rejecting sexual advances" does not constitute protected activity).

Upon consideration of this case law, the Court agrees with the majority view in part because, as noted in *New Breed Logistics*, it is consistent with the United States Supreme Court's interpretation of Title VII's retaliation provision in *Crawford v. Metropolitan Government of*

8

*Nashville and Davidson County*, 555 U.S. 271 (2009), in which the Court interpreted the term "oppose" to mean "[t]o resist or antagonize," or "to contend against; to confront; resist; withstand." *Id.* at 274, 276 (quoting Webster's New International Dictionary 1710 (2d ed. 1957)) (holding that responding to a question about whether there was inappropriate conduct in the workplace by reporting several harassing incidents constituted protected activity); *see also New Breed Logistics*, 783 F.3d at 1067 (discussing *Crawford*); *Owen*, 358 F. Supp. 3d at 551 (same). Under such a definition, an employee who verbally or otherwise objects to harassing conduct by a supervisor has clearly opposed, confronted, or resisted such harassment regardless of whether the employee made an explicit claim that the conduct constitutes unlawful discrimination. Moreover, this interpretation also aligns with the Fourth Circuit's "expansive view of what constitutes oppositional conduct," which is "not [an] onerous" threshold. *DeMasters*, 796 F.3d at 417.

The Board does not directly dispute this conclusion but instead argues that Doe's specific actions, consisting of twice telling Beidleman that she "was not interested in forming a 'personal relationship'" with him, and of otherwise just "walk[ing] away from conversations" that she deemed harassing, were not sufficiently direct so as to communicate a belief that Beidleman had "engaged in a form of employment discrimination." Reply at 3–4, ECF No. 20. Though the Board correctly notes that, under *DeMasters*, protected activity must, in part, "communicate[] to [the] employer a belief that the employer engaged in . . . a form of employment discrimination," *DeMasters*, 796 F.3d at 418 (quoting *Crawford*, 555 U.S. at 276), *DeMasters* also held that in assessing potential protected activity, courts should not evaluate "an employee's opposition . . . as a series of discrete acts" but rather should "examine [an employee's] conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as whole." *Id.* at 417–18.

Viewing Doe's September 14, 2022 statement rejecting Beidleman's request to engage in a personal relationship in conjunction with the entire course of conduct, and in the light most favorable to Doe as is required at this stage, the Court finds that Doe fairly communicated a belief that Beidleman was engaged in employment discrimination. Over the course of a year, she consistently rebuffed the harassing conduct of her supervisor, Beidleman, which included "thrust[ing] his hips in her direction in a sexual manner," Am. Compl. ¶ 18, "putting his pelvis area close to her," *id.* ¶ 21, and ultimately verbally "attempt[ing] to proposition her and start a personal relationship with her" during a phone call "well after work hours," *id.* ¶ 26, by physically walking away from him and explicitly rejecting his requests. Indeed, courts have found that "moving away" from harassing activity and "keep[ing] a distance from" a harasser "to minimize his opportunities to harass" can constitute protected activity. *See Huang*, 116 F.4th at 562. Moreover, Doe did not just communicate her belief to Beidleman, she also told MCPS Associate Superintendent Morris about Beidleman's "inappropriate phone call on September 14, 2022," which even more clearly communicated to her employer a belief that Beidleman was engaging in unlawful sexual harassment. Am. Compl. ¶ 29; *see Owen*, 358 F. Supp. 3d at 547, 551–52 (finding that an employee engaged in protected activity where she "repeatedly told" her supervisor and harasser "to cease the harassment" and also told a Human Resources official about the harassment). Accordingly, the Court finds that, "judging the picture as a whole," *DeMasters*, 796 F.3d at 418, Doe has pleaded sufficient facts on the protected activity element of her retaliation claims.

### III. Materially Adverse Action

The Board also argues that the allegations do not support the second prong of a retaliation claim, that Doe was subjected to a materially adverse action. The Supreme Court has held that for purposes of a Title VII retaliation claim, a materially adverse action is one which "well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In *Burlington Northern*, the Court specifically rejected the application of the more stringent standard, then applicable to discrimination claims, that such adverse actions must "affect the terms and conditions of employment" and consist of "so-called 'ultimate employment decisions'" such as those relating to "hiring, granting leave, discharging, promoting, and compensating" employees. *Id.* at 60, 64, 67 (citations omitted); *see Lettieri v. Equant Inc.*, 478 F.3d 640, 650 n.2 (4th Cir. 2007).

Doe alleges that after she engaged in protected activity, she was placed on administrative leave in December 2022, forced to undergo an IME relating to her mental health before she could return from administrative leave, placed on the involuntary transfer list in February 2023, and involuntarily transferred to Forest Oak in June 2023. In asserting that these actions do not qualify as materially adverse actions, the Board primarily focuses, contrary to the *Burlington Northern* standard, on the claim that these actions do not affect the terms and conditions of employment such as through a decrease in compensation, job title, level of responsibility, or opportunity for promotion. *See* Mot. at 8–12, ECF No. 18-1. In doing so, the Board relies significantly on case law that either predates *Burlington Northern* or incorporates definitions or interpretations of the term "adverse employment action" applicable in a discrimination case rather than a retaliation case. *See, e.g., Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001) (in a decision that predates *Burlington Northern*, holding that an "[a]dverse employment action" for purposes of a retaliation claim includes an act that "results in an adverse effect on the 'terms, conditions, or benefits' of employment" (quoting *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997))); *Nzabandora v. Rectors & Visitors of the Univ. of Va.*, 749 F. App'x 173, 175 (4th Cir. 2018) (in an unpublished decision, finding that "placement on paid leave pending

investigations into [] alleged misconduct" was not an "adverse employment action" for purposes of a retaliation claim, but relying on another court's conclusion in relation to a discrimination claim that "[a] paid suspension pending an investigation of an employee's alleged wrongdoing" did not constitute an adverse employment action under Title VII (quoting *Jones v. S.E. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015))); *Fordyce v. Prince George's Cnty.*, 43 F. Supp. 3d 537, 548 (D. Md. 2014) (in a retaliation case, defining an "adverse employment action" as one that "adversely affect[s] the terms, conditions, or benefits[] of the plaintiff's employment" but relying on a Fourth Circuit decision discussing a Title VII discrimination claim (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004))). The Board's arguments based on this case law fail because they are based on the wrong legal standard. *See Burlington N.*, 586 U.S. at 64, 67.

As for whether the identified actions meet the *Burlington Northern* materially adverse action standard, that determination "often depend[s] upon the particular circumstances" of the employee and the workplace. *Id.* at 69. As to her placement on administrative leave with pay, courts applying the *Burlington Northern* standard have found that such an action may qualify as a materially adverse action. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (concluding that "brief placement on paid administrative leave" could be a materially adverse action). Here, the circumstances of Doe's administrative leave had an additional component in that the leave was coupled with an accusation that she was mentally unfit to do her job and a requirement that she complete an IME relating to her mental health in order to return to work, both of which caused her "stress." Am. Compl. ¶ 38. The Court finds that the combination of placement on leave and the accusations and testing relating to Doe's mental health establishes a materially adverse action because it could dissuade a reasonable worker from complaining about

discrimination. *See Freitag v. Ayers*, 468 F.3d 528, 542 n.7 (9th Cir. 2006) (finding that temporary removal from duty coupled with a psychiatric evaluation and internal affairs investigations would be "considered materially adverse").

As for Doe's transfer to Forest Oak, in *Burlington Northern*, the Supreme Court found that a reassignment of job duties, including one to a less desirable or prestigious role at the same pay, can constitute a materially adverse action, depending on "the circumstances of the particular case" as "judged from the perspective of a reasonable person in the plaintiff's position." *See Burlington N.*, 548 U.S. at 70–71. Here, Doe has asserted that the reassignment to Forest Oak was less desirable to her because it lengthened her commute and because it was a less prestigious assignment in that Forest Oak "is one of MCPS's lowest performing schools." Am. Compl. ¶ 40. At this early stage, Doe has sufficiently alleged that the transfer to Forest Oak was a materially adverse action. The Court thus finds that Doe's allegations satisfy the materially adverse action element.

## IV.   Causation

As for the third element, causation, an employee can establish a causal connection between protected activity and a materially adverse action "by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers v. City of Laurel*, 895 F.3d 317, 336 (4th Cir. 2018). This showing is "not an onerous burden." *Id.* at 335. Here, the Board argues that (1) Doe has not pleaded sufficient temporal proximity between her protected activity and the alleged materially adverse actions; and (2) with respect to the decisions to require Doe to undergo the IME and to transfer her involuntarily

13

to Forest Oak, Doe has not alleged sufficient facts to show that the relevant decisionmaker was aware of her protected activity.

On the issue of temporal proximity, Beidleman placed Doe on administrative leave on December 5, 2022, approximately two and a half months after Doe's last alleged instance of protected activity—her rejection of a personal relationship with Beidleman during the September 14, 2022 phone call. While there is no "bright-line rule," such a time period, standing alone, may not be sufficient to support an inference of causation. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (finding that a three-month gap between the last report of harassment and the plaintiff's termination did not support a causal link in the absence of evidence that the relevant decisionmaker was aware of the harassment allegations and noting that an unpublished decision of the circuit had previously found that "absent other evidence of a causal relationship, a lapse of two months . . . is sufficiently long so as to weaken significantly the inference of causation"). The Fourth Circuit, however, has also held that when the temporal proximity between protected activity and the allegedly retaliatory conduct is too lengthy, "courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri*, 478 F.3d at 650 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

Here, Doe has alleged that (1) on September 15, 2022, the day after the September 14, 2022 call, Beidleman falsely accused her of violating a professional capacity standard, which then triggered a meeting on September 29 with the Director of the MCPS Office of School Support; and that (2) Beidleman gave her a deadline of December 5, 2022 at 3:00 p.m. to provide him with a written explanation of the December 2, 2022 door closing incident but then did not wait until that deadline and instead placed her on administrative leave on December 5 at 8:00 a.m. Where Doe has alleged facts beyond mere temporal proximity that show apparently retaliatory activity

the day after the protected activity, and a course of conduct relating to the placement on administrative leave that supports the inference that it was pretextual, the Court finds that Doe has pleaded sufficient facts to establish a causal connection between the protected activity and her placement on administrative leave and the accompanying IME required in order to return from leave. *See Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (concluding that, at the motion to dismiss stage, an intervening comment by an employee's supervisor relating to the protected activity combined with allegations of pretext were sufficient to support a plausible inference of causation despite a three-month gap between a plaintiff's protected activity and the materially adverse action).

In light of these same facts, and of the placement on administrative leave in December 2022, the Court also finds that despite the temporal gap, there is a sufficient causal link between Doe's protected activity and the placement of Doe on the involuntary transfer list in February 2023 and the subsequent transfer in June 2023, particularly where it is reasonable to infer that the actions relating to the transfer took place at the first reasonable opportunity to retaliate in that manner. *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (stating that "in the context of [a] particular employment situation," a length of time of more than two months "does not undercut the inference of causation" because the materially adverse action occurred at a "natural decision point," specifically, the end of the school year). Here, Doe alleges that she was involuntary transferred on June 24, 2023, which was presumably at the end of the school year and thus at the natural time to transfer an administrator such as an Assistant Principal to another school.

Nevertheless, the Board asserts in its reply brief that Doe has failed to state a plausible retaliation claim relating to either the requirement of an IME relating to mental health or the involuntary transfer because Doe has not alleged sufficient facts to show that the MCPS officials

who made those decisions had knowledge of the protected activity. Under *Roberts*, cited by the Board, in order to prevail on a retaliation claim, Doe must ultimately prove that the relevant decisionmakers who took the materially adverse actions were "aware of the protected activity at the time the alleged retaliation occurred." *Roberts*, 998 F.3d at 124. In *Roberts*, however, the court granted summary judgment on a plaintiff's retaliation claim after full development of a factual record because that record lacked evidence that the company official who terminated the plaintiff was ever made aware of the plaintiff's allegations of sexual harassment. *See id.* at 115, 125–26. Here, at the motion-to-dismiss stage, there has not yet been an opportunity for discovery or development of a factual record. *See Barbour v. Garland*, 105 F.4th 579, 599 (4th Cir. 2024) (stating that "[a] Title VII retaliation claim may survive a motion to dismiss even if the complaint does not allege facts that would later be sufficient to survive a summary judgment motion" and that at "the Rule 12(b)(6) stage, the plaintiff need only allege sufficient facts to support a plausible inference of a causal link between the adverse action and the plaintiff's prior protected activity").

Viewing the allegations in the light most favorable to Doe, the Court finds that they are sufficient to support a reasonable inference of such knowledge. As to the requirement of an IME that included a mental health evaluation, Doe has asserted that Beidleman placed her on administrative leave, and the IME report states that she was placed on such leave because Beidleman had "accused her of displaying mental health symptoms." Am. Compl. ¶ 37. From these facts, it is reasonable to infer that Beidleman, who was aware of the protected activity, was responsible for and aware of the fact that Doe's placement on administrative leave due to concerns about mental health would necessarily result in the need for an IME before she could return to work.

As for the involuntary transfer, Doe specifically alleges that MCPS placed her on the involuntary transfer list on February 16, 2023 "knowing that [she] had been forced to go on medical leave due to Dr. Beidleman's retaliation and false accusations." *Id.* ¶ 39. Drawing all reasonable inferences in favor of Doe, the Court finds that they sufficiently support this allegation of knowledge. Where Beidleman was the Principal of Farquhar, it is reasonable to infer that he was responsible for Doe's placement on the involuntary transfer list, especially where it occurred shortly after his other allegedly retaliatory actions. Moreover, Doe has also alleged facts showing that (1) MCPS senior management was aware of her protected activity in that she informed MCPS Associate Superintendent Morris about the inappropriate September 14, 2022 phone call and that (2) Beidleman's accusations about her failure to meet applicable standards were false. Finally, the fact that the IME found no evidence that Doe was mentally unfit leaves no identifiable reason for the involuntary transfer other than a decision by Beidleman. Although Doe will eventually need to identify and offer specific direct or circumstantial evidence that establishes that the MCPS officials who caused her involuntary transfer were aware of her protected activity, at this early stage before discovery, the Court finds that she has alleged sufficient facts to proceed with these parts of the retaliation claims.

## CONCLUSION

For the foregoing reasons, the Board's Motion to Dismiss will be DENIED. A separate Order shall issue.

Date: April 17, 2025

THEODORE D. CHUANG
United States District Judge